**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**KENNETH D. MURENA**, in his capacity as court-appointed Receiver of Drive Planning, LLC,

Plaintiff,

v.

Civil Action No._____________

**MARK HAYE,**
**TMRW SOLUTIONS, LLC,**
**THE TMRW SOCIETY IRV TRUST,**
**THE TMRW SOCIETY'S TRIBAL TRUST,**
**LONNIE MURPHY FINANCIAL & INS STRATEGIES,**
**LONNIE MURPHY,**
**LARRY M. SPEIR,**
**NEXT LEVEL WEALTH PLANNING,**
**AARON ("AJ") SHANKLIN,**
**BRIC BRADFORD,**
**JOHN LIN,**
**ZEN CATALYST PARTNERS, LLC,**
**CORNERSTONE LEGACY WEALTH, LLC,**
**CORNERSTONE WEALTH, LLC,**
**HECTOR HERRERA,**
**CONFERENCISTA PRO,**
**ROCA CONSTRUCTION, LLC,**
**ROCA GROUP, LLC,**
**ROCA FORTUNA, LLC,**
**PABLO CASAS,**
**HEIDI DRUMMOND,**
**MICHIAL MUMFORD,**
**SHERYL NOLAN,**
**STEPHANE-MAX BOSSE,**

**DANIEL R. STEERE,**
**BRADLEY JOHNSON,**
**JUANA FLORES,**
**CF RENOVATIONS, LLC**
**GERALD JUNDT,**
**CHRISTY GIROUX,**
**CAHG ENTERPRISES, LLC,**
**CAHG RD LLC,**
**NANCY CHOJNACKI,**
**SONNY HOME BUYERS INC.,**
**JOHN W. YOASH,**
**LORENZO LINARDUCCI PLATA /**
**LORENZO LINARDUCCI,**
**DARLENE DE LA PLATA,**
**JEFFREY HOWARD,**
**WEALTH DNA, LLC,**
**DAVID MUNOZ,**
**SU BUENA SALUD, INC.,**
**MARTHA PATINO,**
**DELIA WILSON,**
**DARRELL QUE,**
**HI LEVERAGE FINANCIAL, LLC,**
**HEATHER TUBBS,**
**MICHAEL BRESHEARS,**
**RICHARD GREENMAN,**
**JASON STRUTHERS,**
**MONIQUE MYRICK,**
**NICHOLAS ST. JON,**
**ADVANCED AGENT SERVICES, INC.,**
**RUSSELL HOULE, AND**
**BEST FINANCIAL PARTNERS, LLC,**

Defendants.

---

# ANCILLARY COMPLAINT

Kenneth D. Murena, as Court-Appointed Receiver (the "Receiver") of Drive Planning, LLC, acting pursuant to this Court's Order Appointing Receiver entered in the above-captioned enforcement action and pursuant to Federal Rule of Civil Procedure 66, sues the individuals and entities listed in the caption (collectively "Defendants" or "Agents"), for actual and constructive fraudulent transfers under GUVTA,[1] and unjust enrichment under Georgia common law, to avoid, recover, and disgorge, in excess of $3,300,000.00 these Defendants collectively received from Drive Planning, LLC in the form of improper and illegal commissions paid to them for soliciting and securing investors (mostly victims) in the Drive Planning Ponzi[2] scheme that is at the heart of this U.S. Securities and Exchange Commission ("SEC") enforcement action ("SEC Enforcement Action"),[3] and states:

[1] The Receiver refers to the Georgia Uniform Voidable Transactions Act, O.C.G.A. §§ 18-2-70, *et seq.*, as "GUVTA."

[2] "The term 'Ponzi' derives from Charles Ponzi, a ground-breaking swindler who, in eight months in the early 1900's took in over $9 million by selling notes for $100 with the promise to pay $150 for each note in 90 days." *See SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, n.1 (D.D.C. 1998) (*quoting Cunningham v. Brown*, 265 U.S. 1 (1923)).

[3] The SEC commenced the related enforcement action against Defendant Russell Todd Burkhalter and Drive Planning, LLC on August 13, 2024, commencing the case captioned *SEC v. Drive Planning, LLC*, Case No. 1:24-cv-03583-VWC ("SEC Enforcement Action").

## I. OVERVIEW

1. SEC Enforcement Action Defendant Russell Todd Burkhalter, from 2020 to 2024, through his wholly owned and controlled Drive Planning, LLC ("Drive Planning"), ran a massive Ponzi scheme raising approximately $380,000,000 from approximately 2,400 "investors," returning approximately $160,000,000 in "false profits" to investors using other "investors'" money, and inflicting what is believed to be at least $220,000,000 in investor "net losses." The scale of this Ponzi scheme is staggering, and the investor losses are tragic.

2. The SEC filed the SEC Enforcement Action, obtained the Receiver's appointment, and put an end to the Drive Planning Ponzi scheme before it could cause further harm.

3. The Court presiding over the SEC Enforcement Action tasked the Receiver with administering, preserving, pursuing, and marshaling Drive Planning's assets, which include its litigation claims to recover investor funds improperly and illegally paid to insiders, affiliates, and third parties. Accordingly, the Receiver files this ancillary action against certain individuals and entities that/who received investor money in the form of commissions (the "Commissions") from Drive Planning for helping Mr. Burkhalter and his accomplices promote, continue, expand,

and further the Drive Planning Ponzi scheme by convincing new investors to trust Drive Planning with their money.

4. The Commissions the Agents received from Drive Planning came from investor funds, which also constitute the proceeds from the sale of unregistered securities under applicable federal securities laws making the Commissions ill-gotten gains and subject to avoidance, recovery, and disgorgement under applicable Georgia law that voids contracts for immoral or illegal endeavors and transfers made with fraudulent intent, by an insolvent enterprise, for receipt of no value in return. *See* 15 U.S.C. § 78cc; O.C.G.A. § 13-8-1; O.C.G.A. §§ 18-2-70, *et seq.*

5. A Ponzi scheme of this scale relied on numerous agents (including Defendants) to promote and expand its reach by convincing numerous investors to invest their retirement accounts and to take loans secured by hard-earned equity in their homesteads and use the loan proceeds to invest in Drive Planning and reap the promised 40% "returns."

6. Drive Planning relied heavily on a network of over 160 agents including Defendants and promoters to market its investment program and attract new funds. These individuals used various platforms, including social media and other public-facing channels, to present Drive Planning as a legitimate and trustworthy investment opportunity, thereby encouraging continued inflows of investor funds necessary to sustain the scheme.

7. In exchange for their promotional efforts, these agents were incentivized by the payment of commissions derived from investor funds. In many instances, these commission payments were significant and bore no relation to any legitimate investment performance, but instead were funded by incoming deposits from new investors.

8. Certain agents received particularly large commission payments as a result of their role in soliciting and securing investor funds, reflecting the scale of their participation in promoting the scheme.

9. The commissions paid to these agents were not derived from legitimate business operations, but rather from other investors' deposits, and therefore constitute improper and recoverable transfers.

10. This ancillary action furthers the Receiver's duties to seek to investigate and pursue claims to recover assets of Drive Planning to return to its investors who lost approximately $220 million.

## II. PARTIES

11. Plaintiff, Kenneth D. Murena, is acting solely in his capacity as a federal-court-appointed receiver pursuant to the authority granted to him by this Court in the Order Appointing Receiver (the "Receivership Order") entered in the SEC Enforcement Action, and pursuant to Fed. R. Civ. P. 66. *See* Case No. 1:24-cv-03583-VMC [ECF No. 10].

12. The details concerning the Defendants are listed on pages 28 through 52.

## III. JURISDICTION

### A. Subject Matter Jurisdiction

13. This Court has subject matter jurisdiction over this ancillary action by virtue of the Receivership Order, and this action is incidental to the preservation, collection, and distribution of assets of the Receivership Estate. The Receiver brings this ancillary action against Defendants in furtherance of his duties under the Receivership Order.

14. "Courts have long recognized a federal court's supplemental jurisdiction over actions related to a receivership established in federal court." This Court has subject-matter jurisdiction over the state-law claims asserted in this complaint in this ancillary action pursuant to 28 U.S.C. §§ 754, 1367 because those claims are ancillary to the SEC Enforcement Action, over which the Court in this district has jurisdiction pursuant to 28 U.S.C. § 1331.

15. The SEC Enforcement Action is within the jurisdiction of the federal court in this district under 28 U.S.C. § 1331 and this ancillary action is in furtherance of the Receiver's duties under the Receivership Order entered in the SEC Enforcement Action.

16. The Receiver's claims against the Defendants, each of whom or which were involved with and received funds from Drive Planning, are a well-recognized use of the ancillary jurisdiction of the federal courts.

**B. Personal Jurisdiction**

17. This Court has personal jurisdiction over Defendants because Defendants conducted business with Drive Planning, which was operating, conducting, engaging in, and carrying on a fraudulent business or venture in, among other locations, the Northern District of Georgia. The Commission payments that Defendants received from Drive Planning were proceeds from Drive Planning's fraudulent scheme conducted, in part, in the Northern District of Georgia. Drive Planning is incorporated in Georgia and had its headquarters in Alpharetta, Georgia.

18. This Court has personal jurisdiction over Defendants by virtue of forthcoming personal service of process on them or their execution of a waiver of service in the various judicial districts in the United States in which they reside and conduct business. *See* Fed. R. Civ. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

19. Together, 28 U.S.C. §§ 754 and 1692 provide the necessary statutory authority for the Receiver to have served Defendants in a district outside the territorial boundaries of this Court where the Receiver filed this ancillary action.

20. The Receiver, to comply with those statutes, filed a copy of the complaint that commenced the SEC Enforcement Action and a copy of the

Receivership Order in the Middle District of Florida on August 16, 2024 (Case No. 8:24-mc-00017-WFJ-UAM), Southern District of Indiana on August 13, 2024 (Case No. 1:24-mc-00046-JRS-MKK), Central District of California on August 23, 2024 (Case No. 2:24-mc-0101-UA), Northern District of Illinois on August 23, 2024 (Case No. 1:24-cv-07625), Southern District of Texas on August 23, 2024 (Case No. 4:24-mc-01364), Southern District of Illinois on August 23, 2024 (Case No.3:24-mc-00065-DWD), District of New Hampshire on August 15, 2025 (Case No. 1:25-mc-00086), Western District of Kentucky on August 26, 2024 (Case No. 3:24-mc-00007-DJH), Northern District of California on September 1, 2024 (Case No. 3:24-mc-80229-TSH), District of Arizona on August 23, 2024 (Case No. 2:24-mc-00027), Eastern District of North Carolina on August 23, 2024 (Case No. 5:24-mc-00023-UA), District of Hawaii on August 13, 2024 (Case No. 1:24-cv-03583-VMC), Middle District of Georgia on August 26, 2024 (Case No. 5:24-mc-00005), Southern District of California on August 26, 2024 (Case No. 3:24-mc-01472), District of Nevada (2:26-ms-00014), District of Connecticut (26-cv-00056), and Southern District of Ohio (2:26-mc-00018-DRC-KA).

21. In cases where the court exercises personal jurisdiction by virtue of a federal statute authorizing nationwide service of process, minimum contacts with the United States suffice.

22. This Court has personal jurisdiction over Defendants because they all are located, reside, and conduct business in the United States and have sufficient minimum contacts with the United States.

## IV. VENUE

23. Venue is proper in this district pursuant to 28 U.S.C. §§ 754, 1692 because the SEC Enforcement Action, in which the Receiver was appointed, is pending in this district, and this action is brought to accomplish the objectives of the Receivership Order.

24. The Court entered the Receivership Order on August 13, 2024, and within ten days the Receiver opened miscellaneous proceedings and filed Notices of Receivership (including the SEC Complaint and the Receivership Order) in the various districts in which Defendants reside as described herein.

## CONDITIONS PRECEDENT

25. All conditions precedent to the bringing of this action have been performed, waived, or satisfied, or have occurred.

## V. GENERAL FACTUAL AND PROCEDURAL BACKGROUND

### *The SEC Commences its Enforcement Action and the Court Appoints the Receiver and Ousts Mr. Burkhalter and His Associates*

26. On August 13, 2024, the SEC filed its complaint (the "SEC Complaint") against Drive Planning and Mr. Burkhalter and various relief

defendants, which commenced the SEC Enforcement Action. *See* Case No. 1:24-cv-03583-VMC at ECF No. 1.

27. The SEC immediately obtained preliminary injunctive relief, and other emergency relief. *See id.* at ECF Nos. 2, 11, 16.

28. The SEC, along with filing the SEC Complaint, sought and obtained appointment of the Receiver through a motion to appoint the Receiver and the Receivership Order. *See id.* ECF Nos. 2, 10.

29. The Receivership Order created a receivership estate ("Receivership Estate") comprised of all of the assets of Drive Planning, which became a receivership entity ("Receivership Entity"), whether those assets were owned directly by Drive Planning or were in the possession of third parties subject to claims by the Receivership Estate to avoid, recover, and disgorge the improper transfers made by wrongdoers. *See id.* ECF No. 10.

30. The Receivership Order authorizes the Receiver to investigate and prosecute claims against individuals and entities who/that improperly received funds from Drive Planning pre-receivership. *See id.* Further, pursuant to the requirement in the Receivership Order that the Receiver obtain authority from the court presiding over the SEC Enforcement Action to commence certain ancillary actions, the Receiver sought and obtained authority from that court to commence this action asserting the claims set forth herein. *See id*. ECF Nos. 229, 234.

## VI. FACTUAL BASIS FOR THE RECEIVER'S CLAIMS FOR RELIEF

***Drive Planning Was a Ponzi Scheme and Insolvent from 2020 to 2024***

31. Drive Planning operated as a Ponzi scheme from before 2020 through the SEC's commencement of the SEC Enforcement Action in August 2024.

32. Drive Planning generated little to no profits from legitimate business operations.

33. Drive Planning acquired cash from individuals and entities which believed they were investors in an investment contract (an illegal, unregistered security) and repaid those prior-in-time investors with money received from later-in-time investors because there were no real investments generating any gains or returns.

34. Mr. Burkhalter and his associates also siphoned off funds for themselves from this scheme, which exacerbated the need to increase the velocity of infusions of new cash.

35. Drive Planning, without actual assets, income producing investments, or other business operations, was insolvent during the material periods of time from 2020 to 2024.

36. Mr. Burkhalter and his associates drove it deeper and deeper into insolvency with each new dollar they accepted from an investor by creating a liability without any way to repay that liability other than with new investor money.

***The "R.E.A.L." Opportunity Ponzi Product – an Illegal, Unregistered Security***

37. Mr. Burkhalter and the Agents promoted, offered, sold, and solicited the purchase of illegal, unregistered securities in the form of short-term promissory notes promising quarterly "interest" payments amounting to 10%, which annualized to over 40%.

38. Drive Planning branded its primary product as the R.E.A.L. Opportunity or "R.E.A.L. Plan", which stood for **R**eal **E**state **A**cceleration **L**oans.

39. At no time did Drive Planning attempt to register the R.E.A.L. Opportunity or any other investment product as securities under any federal or state laws.

40. At no time was the R.E.A.L. Opportunity or any other investment product Drive Planning and the Agents offered to the public exempted from registration under federal or state securities laws.

41. At no time did Drive Planning or any Agent obtain an "opinion letter" from a law firm opining that the R.E.A.L. Opportunity or any other investment product that Drive Planning and the Agents offered to the public either (i) were not securities for purposes of federal and state securities laws; or (ii) were securities but were exempt from registration under the federal and state securities laws.

42. Neither the "R.E.A.L. Opportunity," nor any other investment product that Drive Planning and the Agents sold to the public constituted "commercial

promissory notes" for purposes of federal and state securities laws despite their being labeled as "promissory notes."

43. Neither the "R.E.A.L. Opportunity," nor any other investment product that Drive Planning and the Agents sold to the public, constituted short-term, high-quality instruments issued to fund operations and sold only to sophisticated investors.

44. In reality, Drive Planning did not use investor money to loan to real estate developers; rather, it simply paid older investors "fictitious profits" and Agents Commissions and enriched Mr. Burkhalter and his inner circle.

45. Drive Planning and the Agents promoted to the public that the R.E.A.L. Opportunity was an accessible investment and made the following sales pitch in their public promotional offering materials:

- If you have $20,000 you can participate.
- You can use money from your retirement account.
- You do NOT have to be an Accredited Investor.
- You can use money from savings.
- You can use money from a line of credit.

46. To maximize the amount of money Drive Planning and the Agents could extract from each investor, they pushed investors toward "hard-money" home-equity lines of credit.

47. Drive Planning and the Agents promoted to the public that the R.E.A.L. Opportunity was an accessible investment and made the following sales pitch in their public promotional offering materials: "If you have good credit and good income we may be able to help you receive up to $200,000 for the REAL plan."

48. Agents circulated public offering documents in the form of, among other things, PDF brochures that were transmitted by electronic means, such as email and text message, and made available on Drive Planning's website www.driveplanning.com.

49. Drive Planning and the Agents informed prospective investors that they did not need to be "accredited investors," as that term is defined by the federal securities regulations.

50. The R.E.A.L. Opportunity purported to be a short-term interest-bearing loan (10% paid quarterly, which equates to 40% annually) that Drive Planning used for bridge loans in the commercial real estate sector. But Drive Planning did not use investor funds for the promised purpose.

51. The R.E.A.L. Opportunity involved an investment of money, as each investor gave Drive Planning money expecting repayment of that money plus a "return" of extra money over and above what they had "invested," in the form of interest payments or profits.

52. Drive Planning and the Agents, through the "R.E.A.L. Opportunity," promised investors a fixed rate of return.

53. Drive Planning and the Agents promised investors there was collateral yet no investor was ever provided with any document or instrument that would actually pledge collateral to any "investor."

54. Almost all of the property Drive Planning and the Agents told investors was their collateral was not even titled in the name of or owned by Drive Planning, and there were not documents through which those separated entities guaranteed any obligation of Drive Planning to the Drive Planning "investors."

55. The "R.E.A.L Opportunity" was marketed as "100% Passive Income from Real Estate Investments."

56. Drive Planning's investors were dependent upon the expertise and efforts of the investment promoter for their returns – 100% passive income from the real estate investments Drive Planning claimed to make on behalf of "investors."

57. Drive Planning and the Agents, in their public offering and marketing materials, provided to the public (nationwide and internationally), described how they claimed the R.E.A.L. Opportunity worked:

> We have a program that helps real estate developers get more projects, even while they're still finishing up others. The thing is, traditional lenders like banks usually won't offer this kind of loan because all of the regulations and red tape involved. But we're different – we only work with developers who have a track record of success, and they

> agree to share their profits with us and our lenders (which is you!). Our program is called the REAL Plan, and it basically allows developers to speed up their business growth, while also helping our lenders (you!) grow their wealth. It's a win-win situation for everyone involved!

58. Drive Planning's investors did not loan money to real estate developers but instead Drive Planning claimed to pool the "investors'" money to then loan it to real estate developers such that investor money was pooled for investment purposes that would then generate a promised fixed rate of return.

59. Drive Planning did not permit its investors to be involved with the alleged real estate loans or with the purported real estate investment partners.

60. Instead, Drive Planning investors entirely relied upon what they were told were the entrepreneurial or managerial efforts of Drive Planning personnel and the real estate developers.

61. Drive Planning's investors had no control over their investments, to whom their money was allegedly allocated, the purported project for which the loan was made, or any other aspect of the investment.

62. Drive Planning's personnel (the promoters) purportedly placed the investors' funds with real estate developers constituting the "essential managerial efforts" of Drive Planning's investment product.

63. Drive Planning and the Agents marketed the R.E.A.L. Opportunity to the public as a high rate of return product (much higher than the average stock market investment returns) at 10% every three months and annualized at over 40%.

64. Drive Planning and the Agents, in the public offering memorandum they provided to the public to solicit and secure investor funds in the "R.E.A.L Opportunity," provided the following Table to demonstrate the annual "return" or "profit" on a $100,000 "investment:"

| COMPOUND INTEREST CALCULATOR | |
|---|---|
| INPUTS | |
| Real loan | $100,000 |
| Quarters/Year | 4 |
| Interest Rate | 10% |
| RESULT | |
| Future value | $146,410.00 |

65. None of the investments Drive Planning and the Agents offered to investors were registered under the federal securities laws.

66. Drive Planning and its Agents, by soliciting and securing investors, and receiving investor money pertaining to the R.E.A.L. Opportunity engaged in the sale of unregistered securities in violation of the federal securities laws and Georgia law pertaining to immoral and illegal contracts. *See* O.C.G.A. § 13-8-1.

67. Burkhalter was never licensed with the SEC to sell securities, and Drive Planning was not registered with the SEC.

68. Burkhalter leveraged an outward display of wealth to entice, encourage, and convince prospective investors that the Ponzi scheme was legitimate.

69. Burkhalter was assisted by the Agents that drew in their clients, customers, followers, friends, and family in exchange for Commission payments from investor funds that, in some cases, amounted to millions of dollars.

70. With the Agents' assistance, Burkhalter was able to con investors out of approximately $380 million.

71. Drive Planning's website, www.driveplanning.com, featured a page entitled "Our Team" upon which the Agents authorized Drive Planning to feature their profiles (often with their pictures) representing to the public that the Agents were Drive Planning "Financial Consultants" and were in fact representing Drive Planning and selling Drive Planning's products.

72. Some of the Agents, by placing their profiles on Drive Planning's website, represented to the public that they themselves endorsed Drive Planning as a firm, Drive Planning's products, including the "R.E.A.L. Opportunity," and gave legitimacy to the Ponzi scheme through leveraging their reputation, credentials, and clientele to benefit themselves in the form of the Commissions they received from investor funds.

73. Drive Planning provided the Agents with email addresses which included some form of the Agent's name @driveplanning.com.

74. The Agents also took part in the marketing efforts by utilizing their own platforms and followers to lure in investors and reap the benefits through hefty Commissions.

75. Ultimately, each of the Agents sued in this ancillary action brought in investors and received ill-gotten gains in the form of the Commissions which the Receiver seeks to avoid and recover in this ancillary action.

76. On January 21, 2026, the United States commenced a criminal action against Mr. Burkhalter charging him with committing wire fraud under 18 U.S.C. § 1343 based on the fraud that he perpetrated through Drive Planning, styled *United States of America v. Russell Todd Burkhalter*, Case No.:26-cr-00002-TRJ in the U.S. District Court for the Northern District of Georgia (the "Burkhalter Criminal Action").

77. On January 21, 2026, Mr. Burkhalter pled guilty as to the sole count of the information pursuant to a plea agreement. *See* Guilty Plea and Plea Agreement, Burkhalter Criminal Action, ECF No. 8-1.

78. On November 11, 2025, the United States commenced a criminal action against David Bradford charging him with committing wire fraud under 18 U.S.C. § 1343 based on his involvement with Drive Planning, styled *United States of America v. David Bradford*, Case No.:26-cr-00002-TRJ in the U.S. District Court for the Northern District of Georgia (the "Bradford Criminal Action"). David Bradford was

Drive Planning's most highly compensated agent, having received millions of dollars in payments derived from the fraudulent scheme.

79. On January 21, 2026, Mr. Bradford pled guilty as to the sole count of the information pursuant to a plea agreement. *See* Guilty Plea and Plea Agreement, Bradford Criminal Action, ECF No. 8-1.[4]

***The Receiver Has Standing to Bring Fraudulent Transfer and Unjust Enrichment Claims against the Agents to Avoid, Recover, and Disgorge the Commissions***

80. The Receiver has standing to assert claims against third parties who/that received funds, caused damage, or who/that are in possession of assets belonging to the Receivership Estate. *See* 28 U.S.C. §§ 754 and 1692; *Scholes v. Lehman*, 56 F.3d 750 (7th Cir. 1995); *Donell v. Kowell*, 533 F. 3d 762 (9th Cir. 2008); *Perkins v. Haines*, 661 F.3d 623 (11th Cir. 2011); *Wing v. Dockstader*, 482 F. App'x 361 (10th Cir. 2012); *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006).

81. The Receiver has standing to recover payments Drive Planning made to the Agents in the form of Commissions, as Drive Planning made these payments

[4] On December 19, 2025, the SEC filed a civil complaint against Gerardo L. Linarducci and David J. Bradford in the U.S. District Court for the Northern District of Georgia, Case No. 1:25-cv-00475- TRJ (the "SEC-Linarducci Action"). *See* SEC-Linarducci Action, ECF No. 1. Gerardo L. Linarducci is the former managing partner of Drive Planning and was head of the company's Indiana branch office. Mr. Linarducci worked at Drive Planning from July 2022 until August 2024. In the SEC-Linarducci Action, the SEC alleges that Mr. Linarducci was part of Drive Planning's senior management team and that he played a crucial role in perpetrating the alleged "REAL Ponzi scheme."

solely to promote, continue, expand, and further the size and participation of the Drive Planning Ponzi scheme, and such payments constitute avoidable and recoverable fraudulent transfers under GUVTA and benefits subject to disgorgement under Georgia's unjust enrichment common law.

82. The Court's removal of Mr. Burkhalter and his accomplices, appointment of the Receiver, and creation of the Receivership Estate and Receivership Entity Drive Planning, cleansed the Receivership Estate and Receivership Entity Drive Planning such that the Receiver has standing to bring claims to recover the payments pre-Receivership Entity Drive Planning made to the Agents in the form of the Commissions when Drive Planning was entirely controlled by Mr. Burkhalter and his accomplices. *See Hays v. Adam*, 512 F. Supp. 2d 1330 (N.D. Ga. 2007).

***The Receiver Brings the Claims Within the Applicable Statutes of Limitations and Applicable Equitable Tolling Doctrines***

83. GUVTA provides that claims for actual fraudulent transfers (*i.e.*, transfers made with actual intent to defraud a creditor) must be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." *See* O.C.G.A. § 18-2-79.

84. The Receiver was appointed on August 13, 2024, has diligently investigated Drive Planning's financial records, and, within approximately three

months after his appointment began the process to identify claims to recover funds from third parties, insiders, and affiliates of Drive Planning.[5] Over a period of months, the Receiver gathered all of Drive Planning's bank records, after which his forensic accountant began preparing a reconstruction of accounts that the Receiver could use to identify recipients of recoverable fraudulent transfers. Because many recipients of transfers from Drive Planning had also invested with Drive Planning, however, the Receiver needed to complete the Court-approved claims process (through which investors and Agents submitted claims with documentation of their investments) before the forensic reconstruction of accounts could be sufficiently completed to enable the Receiver to confirm who received recoverable net gains. In or around March 2026, using the data compiled through the claims process, the forensic reconstruction of accounts was sufficiently updated to enable the Receiver to discover which investors and Agents realized net gains from the Drive Planning Ponzi scheme that are recoverable as fraudulent transfers or unjust enrichment.

85. The Receiver sues Defendants to recover Commissions paid to them as actual fraudulent transfers under O.C.G.A. § 18-2-74(a)(1) that were made: (a) within one year after the transfer was or could reasonably have been discovered by the Receiver; and (b) within four years after the transfer was made.

---

[5] The Receiver did not and could not identify any claims to recover the Commissions on the date of his appointment.

86. The Receiver sues Defendants to recover Commissions paid to them as constructive fraudulent transfers under O.C.G.A. § 18-2-74(a)(2) that Drive Planning made within four years after Drive Planning made the transfer.

87. The Receiver sues Defendants, under the Georgia common law theory of unjust enrichment, to recover Commissions Drive Planning paid to Defendants within the four-year period prior to the date upon which the Receiver filed this ancillary complaint. *See* O.C.G.A. § 9-3-26.

88. The Receiver sues Defendants, for Georgia common law unjust enrichment, to recover Commissions Drive Planning paid to Defendants outside of the four-year period prior to the date upon which the Receiver filed this ancillary complaint based upon the doctrines of equitable tolling, equitable estoppel, and delayed discovery, and the mandate of the Receivership Order, which are supported by the following facts:

a. Drive Planning and the Agents actively concealed the nature of Drive Planning's Ponzi scheme, and the Commissions Drive Planning paid to the Agents, to perpetuate the Ponzi scheme by bringing in new investors so that their money could be used to pay earlier investors' "returns" to keep the scheme alive and running, including the payment of Commissions;

b. Drive Planning and the Agents have actual intent to mislead or conceal their sales of unregistered and illegal securities, which involve moral

turpitude, and such sales were the very acts for which Drive Planning paid the Agents the Commissions;

c. The Agents owed fiduciary duties to Drive Planning through the principal and agent relationship of trust and confidence and, therefore, had a duty to disclose illegal and improper sale of unregistered securities so, if they acted in mere silence, such silence is sufficient to toll the statute of limitations;

d. The Agents owed fiduciary duties to the investors to whom/which they sold Drive Planning's illegal unregistered securities because an agent that takes it upon himself/herself/itself to sell a financial product to the public assumes a duty to the individual or entity to whom or which he/she/it sells that product to have reasonable knowledge about the product or investment strategy being recommended, including information discovered from the mandatory investigation the financial performance of and personnel background of the investment manager and offering company because an agent should never rely solely on a sponsor or issuer's evaluation of an investment product. Under that duty, an Agent's mere silence concerning the fraud that was discovered or should have been discovered upon discharge of his/her/its duty to the public is sufficient to toll the statute of limitations; and

e. The Receivership Order mandates that "as to a cause of action accrued or accruing in favor of the Receivership [Entity] against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action." *See* Case No. 1:24-cv-03583-VMC ECF No. 10 at ¶ 34. The injunction against the Receiver commencing legal proceedings was not lifted until August 7, 2025. *See id*. ECF No. 234.

89. The Receiver could not have discovered the Commission payments prior to his appointment because Drive Planning and the Agents controlled the records that revealed the Commission payments, and the Receiver did not have access to the records that revealed Drive Planning's Ponzi scheme and the Agents' receipt of the Commissions until after his appointment. *See* pp. 22-23, FN 5, *supra*.

90. The Receiver has exercised diligence in administering this Receivership over the fallout from a massive Ponzi scheme and the potential claims against the more than 160 Agents to recover their Commissions and against investors to recover their "net gains" along with the multitude of other activities referenced on the docket in the SEC Enforcement Action and in the Receiver's Status Reports.

91. The Receiver's claims to recover the Commissions, therefore, are timely and within the periods dictated by applicable statutes of limitation or tolling doctrines.

## VII. COMMISSION PAYMENTS TO DEFENDANTS SUBJECT TO AVOIDANCE, RECOVERY, AND DISGORGEMENT

1. The Receiver sues several Agents in this ancillary action to avoid, recover, and disgorge Commission payments in excess of $3,300,000 that Drive Planning made to them in furtherance of its Ponzi scheme from 2020 to 2024.

2. As part of the scheme, Defendants received payments from Drive Planning in the form of Commissions in exchange for soliciting and recruiting investors into Drive Planning. In some instances, Defendants also made investments into Drive Planning. Certain Defendants received payments characterized as investment returns that were not derived from legitimate investment activity but instead were funded by other investor deposits in furtherance of the scheme (the "False Profits"). The Defendants did not provide any reasonable equivalent value in exchange for the False Profits or Commissions. To the extent a Defendant received Commissions and/or False Profits in amounts exceeding the Defendant's investment, such Defendant is a net winner. The Receiver seeks to avoid, recover, and disgorge from each Defendant the amount of that Defendant's net winnings (the "Net Profit"), calculated as the total Commissions and False Profits received, less any investment.

3. Schedules of the respective transfers to each Defendant, and investments by each Defendant (if any), are attached as **Exhibits A to II** ("Commission Schedules").

***Mark Haye***

4. Defendant, Mark Haye, is a citizen of the State of Florida.

5. From April 7, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $1,279,356.96 to Mark Haye as Commissions. *See* **Exhibit A**.

6. From March 29, 2023 through April 16, 2024, Mark Haye made transfers totaling $1,529,600.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

7. From October 16, 2023 through February 9, 2024, Mark Haye received $618,200.00 in False Profits. *See id*.

8. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Haye the Net Profit of $367,956.

***TMRW Solutions, LLC, The TMRW Society IRV Trust, and The TMRW Society's Tribal Trust***

9. Defendant, TMRW Solutions LLC, is a limited liability company in the State of Georgia.

10. Defendant, The TMRW Society IRV Trust, is a company in the State of Georgia.

11. Defendant, The TMRW Society's Tribal Trust, is a company in the State of Georgia and may be served with process in Fulton County, which is within

the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

12. Upon information and belief, TMRW Solutions, LLC, The TMRW Society IRV Trust, and The TMRW Society's Tribal Trust (collectively, the "TMRW Defendants") are related and commonly controlled entities that functioned as a single enterprise, sharing management, control, and financial interests in connection with the transfers at issue.

13. From May 20, 2022 through June 14 2024, Drive Planning made transfers totaling $226,675.93 to Defendant TMRW Solutions, LLC as Commissions. *See* **Exhibit B**.

14. On December 14, 2022, TMRW Society IRV Trust made a transfer totaling $250,000 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

15. From June 15, 2023 through March 15, 2024, TMRW Society IRV Trust received $364,665.50 in False Profits. *See id*.

16. The Receiver demands and seeks to avoid, recover, and disgorge from the TMRW Defendants the Net Profit of $341,341.43.

***Lonnie Murphy Financial & Ins Strategies and Lonnie Murphy***

17. Defendant, Lonnie Murphy Financial & Insurance Strategies, is a corporation located in the State of California.

18. Defendant, Lonnie Murphy, is a citizen of the State of California.

19. From May 19, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $208,248.77 to Defendant Lonnie Murphy Financial & Ins Strategies as Commissions. *See* **Exhibit C**.

20. Upon information and belief, Defendant Lonnie Murphy Financial & Ins Strategies subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Lonnie Murphy.

21. The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Lonnie Murphy and Lonnie Murphy Financial & Ins Strategies the Net Profit of $208,248.77.

***Larry M. Speir***

22. Defendant, Larry M. Speir, is a resident of Monroe County, Illinois.

23. From July 28, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $245,473.00 to Defendant Larry M. Speir as Commissions. *See* Summary of Commissions to Defendant Larry M. Speir, attached hereto as **Exhibit D**.

24. On June 30, 2023 through December 6, 2023, Defendant Larry M. Speir made transfers totaling $40,000 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

25. The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Larry M. Speir the Net Profit of $205,473.00.

***AJ Shanklin and Next Level Wealth Planning***

26. Defendant, AJ Shanklin, is a citizen of the State of Kentucky.

27. Defendant, Next Level Wealth Planning LLC, is a limited liability company in the State of Kentucky and may be served with process in Christian County, which is within the Western District of Kentucky, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

28. From June 16, 2023 through May 31, 2024, Drive Planning made transfers in the total amount of $170,994.15 to Defendant Next Level Wealth Planning as Commissions. *See* Summary of Commissions to Defendant Next Level Wealth Planning, attached hereto as **Exhibit E**.

29. Upon information and belief, Defendant Next Level Wealth Planning subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Aaron ("AJ") Shanklin.

30. The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Next Level Wealth Planning and Aaron ("AJ") Shanklin the Net Profit of $170,994.15.

***Bric Bradford***

31. Defendant, Bric Bradford, is a citizen of the State of Indiana.

32. From August 25, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $168,362.93 to Defendant Bric Bradford as Commissions. *See* Summary of Commissions to Defendant Bric Bradford, attached hereto as **Exhibit F**.

33. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Bric Bradford the Net Profit of $168,362.93.

***John Lin, Zen Catalyst Partners, LLC, Cornerstone Legacy Wealth, LLC, and Cornerstone Wealth, LLC***

34. Defendant, John Lin, is a citizen of the State of California.

35. Defendant, Zen Catalyst Partners LLC, is a limited liability company in the State of California.

36. Defendant, Cornerstone Legacy Wealth, LLC, is a limited liability company in the State of California.

37. Defendant, Cornerstone Wealth, LLC, is a limited liability company in the State of California.

38. From January 12, 2024 through April 5, 2024, Drive Planning made transfers in the total amount of $38,286.16 to Zen Catalyst Partners, LLC as Commissions. *See* Summary of Commissions to Defendant Zen Catalyst Partners, LLC, attached hereto as **Exhibit G**.

39. Upon information and belief, Defendant Zen Catalyst Partners, LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, John Lin.

40. From June 1, 2023 through January 29, 2024, Defendant John Lin through his entities Cornerstone Legacy Wealth, LLC and Cornerstone Wealth, LLC made transfers totaling $671,396.94 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

41. From September 5, 2023 through May 15 2024, Defendants Cornerstone Legacy Wealth, LLC and Cornerstone Wealth, LLC received $794,512.69 in False Profits. *See id*.

42. The Receiver demands and seeks to avoid, recover, and disgorge from the Defendants John Lin, Zen Catalyst Partners, LLC, Cornerstone Legacy Wealth, LLC, and Cornerstone Wealth, LLC the Net Profit of $161,401.91.

***Hector Herrera and His Alter-Ego Conferencista Pro LLC***

43. Defendant, Hector Herrera, is a citizen of the State of Illinois.

44. Defendant, Conferencista Pro LLC, is a limited liability company in the State of Illinois.

45. From February 24, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $290,653.48 to Conferencista Pro LLC as

Commissions. *See* Summary of Commissions to Defendant Conferencista Pro LLC, attached hereto as **Exhibit H**.

46. Upon information and belief, Defendant Conferencista Pro LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Hector Herrera.

47. From September 15, 2023 through June 3, 2024, Conferencista Pro LLC made transfers totaling $130,630.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

48. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Herrera the Net Profit of $160,023.48.

***Roca Construction, LLC, Roca Group, LLC, Roca Fortuna, LLC, and Pablo Casas***

49. Defendant, Roca Construction, LLC, is a limited liability company in the State of Georgia.

50. Defendant, Roca Group, LLC, is a limited liability company in the State of Georgia.

51. Defendant, Roca Fortuna, LLC, is a limited liability company in the State of Georgia.

52. Defendant, Pablo Casas, is a citizen of the State of Georgia and may be served with process in Fulton County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

53. From January 12, 2024 through June 14, 2024, Drive Planning made transfers in the total amount of $71,079.00 to ROCA Fortuna, LLC as Commissions. *See* Summary of Commissions to Defendant ROCA Fortuna, LLC, attached hereto as **Exhibit I**.

54. Upon information and belief, Defendant ROCA Fortuna, LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Pablo Casas.

55. From January 31, 2022 through August 4, 2023, Defendant Pablo Casas through his entities Roca Construction, LLC, Roca Group, LLC, and Roca Fortuna, LLC made transfers totaling $5,703,646.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

56. From September 7, 2023 through May 21, 2024, Defendants Roca Construction, LLC, Roca Group, LLC, and Roca Fortuna, LLC received $5,789,742.60 in False Profits *See id*.

57. Upon information and belief, Defendants Roca Construction, LLC, Roca Group, LLC, and ROCA Fortuna, LLC subsequently transferred all funds they received from Drive Planning to their alter-ego, sole owner, and manager, Pablo Casas.

58. The Receiver demands and seeks to avoid, recover, and disgorge from the Defendants Pablo Casas, Roca Construction, LLC, Roca Group, LLC, and Roca Fortuna, LLC the Net Profit of $157,175.60.

***Heidi Drummond***

59. Defendant, Heidi Drummond, is a citizen of the State of North Carolina.

60. From May 20, 2022 through June 30, 2023, Drive Planning made 23 transfers in the total amount of $29,492.69 to Heidi Drummond as Commissions. *See* Summary of Commissions to Defendant Heidi Drummond, attached hereto as **Exhibit J.**

61. From March 1, 2022 through May 19, 2023, Defendant Heidi Drummond made transfers totaling $280,625.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

62. From March 11, 2022 through August 10, 2023, Defendant Heidi Drummond received $403,850.99 in False Profits. *See id*.

63. The Receiver demands and seeks to avoid, recover, and disgorge from the Heidi Drummond the Net Profit of $152,718.68.

***Michial Mumford***

64. Defendant, Michail Mumford, is a citizen of the State of Indiana.

65. From March 10, 2023 through June 14, 2024, Drive Planning made 27 transfers in the total amount of $152,361.43 to Defendant Michial Mumford as

Commissions. *See* Summary of Commissions to Defendant Michial Mumford, attached hereto as **Exhibit K**.

66. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Michial Mumford the Net Profit of $152,361.43.

***Sheryl Nolan***

67. Defendant, Sheryl Nolan, is a citizen of the State of Florida.

68. From May 20, 2022 through May 19, 2023, Drive Planning made transfers in the total amount of $15,415.70 to Sheryl Nolan as Commissions. *See* Summary of Commissions to Defendant Sheryl Nolan, attached hereto as **Exhibit L**.

69. From February 10, 2022 through January 11, 2023, Defendant Sheryl Nolan made transfers totaling $175,000.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

70. From March 7, 2022 through July 12, 2023, Defendant Sheryl Nolan received $260,153.50 in False Profits *See id*.

71. The Receiver demands and seeks to avoid, recover, and disgorge from the Sheryl Nolan the Net Profit of $100,569.20.

***Stephane-Max Bosse***

72. Defendant, Stephane Max-Bosse, is a citizen of the State of New Hampshire.

73. From September 23, 2022 through June 14, 2024, Drive Planning made transfers in the total amount of $94,483.08 to Defendant Stephane-Max Bosse as Commissions. *See* Summary of Commissions to Defendant Stephane-Max Bosse, attached hereto as **Exhibit M**.

74. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Stephane-Max Bosse the Net Profit of $94,483.08.

***Daniel R. Steere***

75. Defendant, Daniel Steere, is a citizen of the State of Georgia.

76. From March 24, 2023 through May 31, 2024, Drive Planning made transfers in the total amount of $157,922.91 to Daniel R. Steere as Commissions. *See* Summary of Commissions to Defendant Daniel R. Steere, attached hereto as **Exhibit N**.

77. From November 15, 2022 through March 2, 2023, Defendant Daniel R. Steere made transfers totaling $179,249.03 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

78. From September 7, 2023 through May 21, 2024, Defendant Daniel R. Steere received $110,657.04 in False Profits. *See id*.

79. The Receiver demands and seeks to avoid, recover, and disgorge from the Daniel R. Steere the Net Profit of $89,330.92.

***Bradley Johnson***

80. Defendant, Bradley Johnson, is a citizen of the State of California.

81. From August 25, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $80,369.02 to Defendant Bradley Johnson as Commissions. *See* Summary of Commissions to Defendant Bradley Johnson, attached hereto as **Exhibit O**.

82. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Bradley Johnson the Net Profit of $80,369.02.

***Juana Flores and CF Renovations, LLC***

83. Defendant, Juana Flores, is a citizen of the State of Illinois.

84. Defendant, CF Renovations, LLC, is a limited liability company in the State of Illinois.

85. From June 17, 2022 through June 14, 2024, Drive Planning made 31 transfers totaling $53,172.68 to Defendant CF Renovations, LLC as Commissions. *See* Summary of Commissions to Defendant CF Renovations, LLC, attached hereto as **Exhibit P**.

86. Upon information and belief, Defendant CF Renovations, LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Juana Flores.

87. On March 24, 2022 and October 12, 2022, Defendant Juana Flores made transfers totaling $80,000.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

88. From April 11, 2022 through March 25, 2024, Defendant Juana Flores received $99,590.00 in False Profits. *See id*.

89. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant CF Renovation, LLC and Juana Flores the Net Profit of $72,762.68.

***Gerald Jundt***

90. Defendant, Gerald Jundt, is a citizen of the State of Georgia.

91. From May 20, 2022 through July 28, 2023, Drive Planning made transfers in the total amount of $27,270.01 as Commissions. *See* Summary of Commissions to Defendant Gerald Jundt, attached hereto as **Exhibit Q**.

92. From January 21, 2022, Defendant Gerald Jundt made a transfer totaling $50,000.00 to Drive Planning for a purported investment in its fraudulent scheme. *See id*.

93. From February 28, 2022 through July 24, 2023, Defendant Gerald Jundt received $88,970.00 in False Profits. *See id*.

94. The Receiver demands and seeks to avoid, recover, and disgorge from the Gerald Jundt the Net Profit of $66,240.01.

***Christy Giroux, CAHG Enterprises, LLC,* and *CAHG RD LLC***

95. Defendant, Christy Giroux, is a citizen of the State of Arizona.

96. Defendant, CAHG Enterprises, LLC, is a limited liability company in the State of Arizona.

97. Defendant, CAHG RD LLC, is a limited liability company in the State of Arizona.

98. From July 1, 2022 through April 21, 2023, Drive Planning made 7 transfers in the total amount of $12,494.50 to Christy Giroux as Commissions. *See* Summary of Commissions to Defendant Christy Giroux, attached hereto as **Exhibit R**.

99. From March 25, 2022 through March 22, 2023, Defendant Christy Giroux, personally and through her alter-egos CAHG RD, LLC and CAHG Enterprises, LLC made transfers totaling $150,000.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

100. From April 11, 2022 through July 17, 2023, Defendant Christy Giroux, personally and through her alter-egos CAHG RD, LLC and CAHG Enterprises, LLC received $202,787.50 in False Profits. *See id*.

101. The Receiver demands and seeks to avoid, recover, and disgorge from Christy Giroux, CAHG Enterprises, LLC, and CAHG RD LLC the Net Profit of $65,282.00.

**Nancy Chojnacki and Sonny Home Buyers Inc.**

92. Defendant, Nancy Chojnacki, is a citizen of the State of Ohio.

102. Defendant, Sonny Home Buyers Inc., is a corporation in the State of Ohio.

103. From January 13, 2023 through June 30, 2023, Drive Planning made numerous transfers totaling $43,356.52 to Defendant Sonny Home Buyers Inc. as Commissions. *See* Summary of Commissions to Defendant Sonny Home Buyers Inc., attached hereto as **Exhibit S**.

104. Upon information and belief, Defendant Sonny Home Buyers Inc. subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Nancy Chojnacki.

105. On June 22, 2022 and September 30, 2022, Defendant Sonny Home Buyers Inc. made transfers totaling $40,000.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

106. On September 26, 2022 and January 3, 2023, Defendant Sonny Home Buyers Inc. received $44,000.00 in False Profits. *See id.*

107. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Nancy Chojnacki and Sonny Home Buyers Inc. the Net Profit of $47,356.52.

***John W. Yoash***

108. Defendant, John W. Yoash, is a citizen of the State of North Carolina.

109. From September 9, 2022 through June 30, 2023, Drive Planning made 18 transfers in the total amount of $43,894.81 to Defendant John W. Yoash as Commissions. *See* Summary of Commissions to Defendant John W. Yoash, attached hereto as **Exhibit T**.

110. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant John W. Yoasha the Net Profit of $43,894.81.

***Lorenzo Linarducci***

111. Defendant, Lorenzo Linarducci, is a citizen of the State of Indiana.

112. From September 8, 2023 through August 9, 2024, Drive Planning made transfers in the total amount of $43,380.00 to Defendant Lorenzo Linarducci as Commissions. *See* Summary of Commissions to Defendant Lorenzo Linarducci, attached hereto as **Exhibit U**.

113. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Lorenzo Linarducci the Net Profit of $43,380.00.

***Darlene De La Plata***

114. Defendant, Darlene De La Plata, is a citizen of the State of Georgia.

115. From June 17, 2022 through June 16, 2023, Drive Planning made transfers in the total amount of $44,351.48 to Defendant Darlene De La Plata as

Commissions. *See* Summary of Commissions to Defendant Darlene De La Plata, attached hereto as **Exhibit V**.

116. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Darlene De La Plata the Net Profit of $44,351.48.

***Jeffrey Howard and Wealth DNA, LLC***

117. Defendant, Jeffrey Howard, is a citizen of the State of California.

118. Defendant, Wealth DNA, LLC, is a limited liability company in the State of California.

119. From September 8, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $38,544.82 to Defendant Wealth DNA, LLC as Commissions. *See* Summary of Commissions to Defendant Wealth DNA, LLC, attached hereto as **Exhibit W**.

120. Upon information and belief, Defendant Wealth DNA, LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Jeffrey Howard.

121. The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Jeffrey Howard and Wealth DNA, LLC the Net Profit of $38,544.82.

***David Munoz and Su Buena Salud, Inc.***

122. Defendant, David Munoz, is a citizen of the State of Illinois.

123. Defendant, Su Buena Salud, Inc., is a corporation in the State of Illinois.

124. From February 10, 2023 through June 14, 2024, Drive Planning made transfers totaling $47,903.92 to Defendant Su Buena Salud, Inc. as Commissions. *See* Summary of Commissions to Defendant Su Buena Salud, Inc., attached hereto as **Exhibit X**.

125. Upon information and belief, Defendant Su Buena Salud, Inc. subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, David Munoz.

126. On February 8, 2023 and January 30, 2024, Defendant David Munoz made transfers totaling $40,000.00 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

127. From May 9, 2023 through March 8, 2024, Defendant David Munoz received $28,420.00 in False Profits. *See id.*

128. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant David Munoz and Su Buena Salud, Inc. the Net Profit of $36,323.92.

***Martha Patino***

129. Defendant, Martha Patino, is a citizen of the State of California.

130. From January 26, 2024 through June 14, 2024, Drive Planning made transfers in the total amount of $35,790.00 to Defendant Martha Patino as Commissions. *See* Summary of Commissions to Defendant Martha Patino, attached hereto as **Exhibit Y**.

131. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Martha Patino the Net Profit of $35,790.00.

***Delia Wilson***

132. Defendant, Delia Wilson, is a citizen of the State of Texas.

133. From October 20, 2023 through June 14, 2024, Drive Planning made transfers in the total amount of $54,242.25 to Delia Wilson as Commissions. *See* Summary of Commissions to Defendant Daniel R. Steere, attached hereto as **Exhibit Z**.

134. On April 22, 2024, Defendant Delia Wilson made a transfer totaling $20,000 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

135. The Receiver demands and seeks to avoid, recover, and disgorge from DeLia Wilson the Net Profit of $34,242.25.

***Darrell Que and Hi Leverage Financial, LLC***

136. Defendant, Darrell Que, is a citizen of the State of Hawaii.

137. Defendant, Hi Leverage Financial LLC, is a limited liability company in the State of Hawaii.

138. From February 9, 2024 through May 31, 2024, Drive Planning made transfers in the total amount of $31,190.00 to Defendant Hi Leverage Financial, LLC

as Commissions. *See* Summary of Commissions to Defendant Hi Leverage Financial LLC, attached hereto as **Exhibit AA**.

139. Upon information and belief, Defendant Hi Leverage Financial LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Darrell Que.

140. The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Darrell Que and Hi Leverage Financial, LLC the Net Profit of $31,190.00.

***Heather Tubbs***

141. Defendant, Heather Tubbs, is a citizen of the State of Georgia.

142. From August 12, 2022 through June 16, 2023, Drive Planning made transfers in the total amount of $31,894.06 to Defendant Heather Tubbs as Commissions. *See* Summary of Commissions to Defendant Heather Tubbs, attached hereto as **Exhibit BB**.

143. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Heather Tubbs the Net Profit of $31,894.06.

***Michael Breshears***

144. Defendant, Michael Breshears, is a citizen of the State of Georgia.

145. From May 3, 2024 through June 14, 2024, Drive Planning made transfers in the total amount of $19,405.00 to Defendant Michael Breshears as

Commissions. *See* Summary of Commissions to Defendant Michael Breshears, attached hereto as ***Exhibit CC***.

146. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Michael Breshears the Net Profit of $19,405.00.

***Richard Greenman***

147. Defendant, Richard Greenman, is a citizen of the State of Florida.

148. From December 1, 2023 through June 14, 2023, Drive Planning made transfers in the total amount of $23,685.00 to Defendant Richard Greenman as Commissions. *See* Summary of Commissions to Defendant Ricard Greenman, attached hereto as **Exhibit DD**.

149. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Richard Greenman the Net Profit of $23,685.00.

***Jason Struthers***

150. Defendant, Jason Struthers, is a citizen of the State of California.

151. From November 3, 2023 through May 31, 2024, Drive Planning made transfers in the total amount of $21,201.30 to Defendant Jason Struthers as Commissions. *See* Summary of Commissions to Defendant Jason Struthers, attached hereto as **Exhibit EE**.

152. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Jason Struthers the Net Profit of $21,201.30.

***Monique Myrick***

153. Defendant, Monique Myrick, is a citizen of the State of Georgia.

154. From August 12, 2022 through June 2, 2023, Drive Planning made transfers in the total amount of $10,901.27 to Monique Myrick as Commissions. *See* Summary of Commissions to Defendant Monique Myrick, attached hereto as **Exhibit FF**.

155. On November 21, 2022, Defendant Monique Myrick made a transfer totaling $20,000 to Drive Planning for investments in Drive Planning's fraudulent scheme. *See id*.

156. From February 25, 2022 through August 22, 2023, Monique received $30,144.00 in False Profits. *See id*.

157. The Receiver demands and seeks to avoid, recover, and disgorge from Monique Myrick the Net Profit of $21,045.27.

***Nicholas St. Jon and Advanced Agent Services, Inc.***

158. Defendant, Nicholas St. Jon, is a citizen of the State of Nevada.

159. Defendant, Advanced Agent Services, Inc., is a corporation in the State of Nevada.

160. From April 11, 2022 through June 16, 2023, Drive Planning made transfers in the total amount of $18,316.32 to Defendant Advanced Agent Services,

Inc. as Commissions. *See* Summary of Commissions to Defendant Advanced Agent Services Inc., attached hereto as **Exhibit GG**.

161. Upon information and belief, Defendant Advanced Agent Services, Inc. subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Nicolas St. Jon.

162. The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Nicolas St. Jon and Advanced Agent Services, Inc. the Net Profit of $18,316.32.

***Russell Houle and Best Financial Partners, LLC***

163. Defendant, Russell Houle, is a citizen of the State of Connecticut.

164. Defendant, Best Financial Partners, LLC, is a limited liability company in the State of Connecticut.

165. On June 14, 2024 and May 31, 2024, Drive Planning made transfers in the total amount of $13,350.00 to Defendant Best Financial Partners, LLC as Commissions. *See* Summary of Commissions to Defendant Best Financial Partners, LLC, attached hereto as **Exhibit HH**.

166. Upon information and belief, Defendant Best Financial Partners, LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Russell Houle.

167. The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Russell Houle and Best Financial Partners, LLC the Net Profit of $13,350.00.

## VIII. CLAIMS FOR RELIEF

## COUNT 1 – ACTUAL FRAUDULENT TRANSFER UNDER GUVTA

168. The Receiver sues Defendants and adopts, realleges, and incorporates paragraphs 1 through 170 into Count 1.

169. Defendants, as Agents, on behalf of Drive Planning, sold, or successfully solicited the purchase of, unregistered securities to the public in violation of the federal securities laws and received the Commissions in return for those sales or that successful solicitation.

170. Defendants sold, or successfully solicited the purchase of, Drive Planning's investment products, including the "R.E.A.L Opportunity" and were motivated at least in part by a desire to serve their own financial interests.

171. Defendants had direct contact with the investors to whom they sold Drive Planning's investment products, including the R.E.A.L. Opportunity.

172. Defendants received Commissions from the sales of Drive Planning's investment products, including the R.E.A.L. Opportunity, to their own family, friends, clients, followers, acquaintances, and contacts, such that the investors' investments were caused by Defendants' solicitation.

173. Defendants directly and actively participated in the solicitation from the investors with whom or which they interacted an immediate sale of Drive Planning's investment products, including the R.E.A.L. Opportunity.

174. The investors with whom or which Defendants interacted invested in, and therefore purchased, Drive Planning's investment products, including the R.E.A.L. Opportunity, as a result of Defendants' solicitation.

175. Defendants received the Commissions from Drive Planning for their direct solicitation of and securing funds from investors, because that was the purpose of the Commissions.

176. Defendants, on behalf Drive Planning, furthered and perpetuated the Ponzi scheme by soliciting and securing investors for Drive Planning so that Drive Planning received new investor money that it could use to pay prior investors the alleged returns on their investments.

177. The Receiver seeks to avoid and recover the Commissions Drive Planning paid to Defendants set forth in the Commission Schedules attached as **Exhibits A** through **HH** pursuant to the actual fraud provision of GUVTA. *See* O.C.G.A. § 18-2-74(a)(1).

178. The Commission Schedules detail the date and amount of each of the Commission payments Drive Planning made to Defendants. *See* **Exhibits A** through **HH**.

179. Drive Planning made the Commission transfers to Defendants in furtherance of the Ponzi scheme, not for value, and with the actual intent to hinder, delay, and defraud creditors, pursuant to O.C.G.A. § 18-2-74(a)(1).

180. Because Drive Planning's payments of Commissions to Defendants were fraudulent transfers made in furtherance of the Ponzi scheme, actual intent to defraud creditors is presumed in a Ponzi scheme under the "Ponzi Scheme Presumption."

181. It is not Defendants' state of mind and intent that is at issue when determining actual fraudulent intent but rather it is the intent of Drive Planning as the ***transferor*** that is operative for purposes of the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(1).

182. Drive Planning operated as a Ponzi scheme and, as such, was insolvent from 2020 to 2024, and the Commission transfers it made to Defendants occurred after Drive Planning had incurred obligations.

183. The Receiver is entitled to the application of the Ponzi Scheme Presumption to these claims.

184. Ponzi schemes are deemed insolvent because their operations involve a fraudulent enterprise that does not generate profit but instead solicits investor funds to repay earlier investors with newer investors' money and incurs liabilities that the enterprise cannot pay each time it accepts new investor funds.

185. As a direct and proximate result of the Commission payments made to Defendants, Drive Planning and the Receivership Estate suffered damages and have been rendered liable to investors, creditors, and other third parties.

186. The Commission payments Drive Planning made to Defendants injured Drive Planning and the Receivership Estate by dissipating its assets.

187. Defendants, as Agents, sold illegal, unregistered securities to the public and were paid the Commissions based upon this conduct.

188. Defendants, as Agents, by selling Drive Planning's illegal, unregistered securities to the public endorsed, gave legitimacy to, and burnished the Drive Planning Ponzi scheme through the imprimatur of their support and sponsorship of Drive Planning and its Ponzi-scheme investment products, by, including, but not limited to, directly affiliating themselves with Drive Planning by among other things, appearing as a "Financial Consultant" on Drive Planning's website (www.driveplanning.com), utilizing an @driveplanning.com email address and account to communicate with Drive Planning personnel, themselves, the public (potential or existing investors), and representing to the public that Drive Planning's illegal and unregistered securities were prudent, safe, and sound investments when they were not.

189. Defendants did not act in good faith when they sold Drive Planning's illegal and unregistered securities to the public for their own profit without having

conducted the required due diligence and/or remained willfully ignorant to the several red flags that would have provided notice of Drive Planning's fraudulent purpose.

190. Those red flags included: (i) the 40% annualized return for a real estate bridge loan; (ii) the vague manner in which the R.E.A.L. Opportunity was described; (iii) the lack of any documentation supporting the claim that loans were collateralized; (iv) the lack of information concerning the purported real estate developers to whom or which the "investors'" funds were being provided; (v) the lack of any insurance or other means to protect investors against losses given the absence of any documentation providing the investors with collateral; and (vi) the sophistication level of Mr. Burkhalter and Mr. Bradford and their lack of experience or references in the commercial real estate lending market.

191. Defendants cannot establish good faith, as they did not consider financial, performance, and personnel and background of the offering company; consider the associated risk factors and costs surrounding the investment strategy or product needed to be disclosed and evaluated; review available investment ratings from qualified rating services before selling or recommending Drive Planning's investment products, including the R.E.A.L. Opportunity; or otherwise investigate the business of Drive Planning and its key employees.

192. The Commission payments were not made by Drive Planning to Defendants in exchange for anything of equivalent value from Defendants and represented nothing more than redirected funds Drive Planning had obtained from new participants in the Drive Planning Ponzi scheme.

193. Defendants provided no value to Drive Planning by selling Drive Planning's illegal and unregistered securities to the public because those transactions constituted illegal transactions and Defendants cannot profit from illegal transactions under Georgia law. *See* O.C.G.A. § 13-8-1.

194. Defendants provided no value to Drive Planning by soliciting and securing investors because each Commission paid was associated with Drive Planning's incurrence of a liability to a new or existing investor that it could not satisfy because it was not a legitimate enterprise but ran solely as a Ponzi scheme.

195. Ponzi scheme "profits," which is what the Commissions constitute, are never received in exchange for value.

196. No agreement between Drive Planning and Defendants under which Drive Planning paid the Commissions is enforceable because Defendants' activities (*i.e.*, selling unregistered securities in violation of federal law) were illegal.

197. The Commission payments Drive Planning made to Defendants set forth on the Commission Schedules at **Exhibits A** through **HH** are avoidable and

recoverable under the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(1).

198. The Receiver is entitled to an award of prejudgment interest based upon the amounts demanded and owed, pursuant to O.C.G.A. § 51-12.4.

199. Further, based upon information and belief, certain individual Defendants, who are the principals of entity Defendants, directed Drive Planning to pay the entity Defendants of which they are the principals, instead of them individually, even though such payments were for the benefit of the individual principals. Such individual Defendants presumably did so to have the entity Defendants act as a shield to protect the individuals from any liability associated with their involvement with Drive Planning. Those individual Defendants dominated and controlled their respective entity Defendants and caused such entities to transfer the Commission payments they received directly to or for the benefit of the individual principals, who then became subsequent transferees of the fraudulent transfers from Drive Planning. As it was the individual Defendants who actually solicited investors and sold the Drive Planning investment products in exchange for which their entities were paid Commissions, the individuals, like their entities, lacked good faith and did not provide value to Drive Planning in exchange for the Commissions. As such, like the initial transfers of the Commissions from Drive Planning to the entity Defendants, the subsequent transfers of the Commissions from

the entity Defendants to the individual Defendants are avoidable and recoverable under the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-78(b)(1)(B).

WHEREFORE, Kenneth D. Murena, as Receiver, respectfully requests the Court (A) enter judgment in his favor and against Defendants: (i) avoiding and recovering the Commission transfers as actual fraudulent transfers under O.C.G.A. § 18-2-74(a)(1); (ii) determining that the entity Defendants were the alter egos of their individual principals rendering the individual principals liable or, alternatively, that the individual Defendants who received Commissions through entities were either the true beneficiaries of the transfers or subsequent transferees of their entities; (iii) entering money judgment against each of Defendants in the amount of the Commission transfers they each received; (iv) awarding pre- and post-judgment interest on the amounts of the judgments entered against Defendants; and (v) taxing costs against Defendants; and (B) reserve jurisdiction to impose constructive trusts on real or personal property of Defendants to which the received Commission transfers are traced under applicable federal and state law; and (C) award such other and further relief as the Court shall deem just and proper.

## COUNT 2 – CONSTRUCTIVE FRAUDULENT TRANSFER UNDER GUVTA

200. The Receiver sues Defendants and adopts, realleges, and incorporates paragraphs 1 through 170 into Count 2.

201. Defendants, as Agents, on behalf of Drive Planning, sold, or successfully solicited the purchase of, unregistered securities to the public in violation of the federal securities laws and received the Commissions in return for those sales, or successful solicitation.

202. Defendants sold, or successfully solicited the purchase of, Drive Planning's investment products, including the "R.E.A.L Opportunity" and were motivated at least in part by a desire to serve their own financial interests.

203. Defendants had direct contact with the investors to whom they sold Drive Planning's investment products, including the R.E.A.L. Opportunity.

204. Defendants received Commissions largely from the sales of Drive Planning's investment products, including the R.E.A.L. Opportunity, to their own family, friends, clients, followers, acquaintances, and contacts, such that the investors' investments were caused by Defendants' solicitation.

205. Defendants directly and actively participated in the solicitation from the investors with whom or which they interacted of an immediate sale of Drive Planning's investment products, including the R.E.A.L. Opportunity.

206. The investors with whom or which Defendants interacted "invested" in, and therefore purchased, Drive Planning's investment products, including the R.E.A.L. Opportunity, as a result of Defendants' solicitation.

207. Defendants received the Commissions from Drive Planning for their direct solicitation of and securing funds from investors, because that was the purpose of the Commissions.

208. The Receiver seeks to avoid and recover the Commissions Drive Planning paid to the Agents set forth in the Commission Schedules attached to this ancillary complaint as **Exhibits A** through **HH** pursuant to the constructive fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(2).

209. The Commission Schedules detail the date and amount of each of the Commission payments Drive Planning made to Defendants.

210. Drive Planning operated as a Ponzi scheme and was insolvent during the relevant periods from 2020 to 2024, and the Commission transfers it made to Defendants occurred after Drive Planning had incurred obligations.

211. Drive Planning made the Commission transfers to Defendants when it was insolvent. By making these payments, Drive Planning either intended to incur, or reasonably should have known that it would incur, debts beyond its ability to pay the debts as they become due, in violation of O.C.G.A. § 18-2-74(a)(2).

212. Defendants did not provide Drive Planning with reasonably equivalent value in exchange for the Commission payments.

213. As a direct and proximate result of the Commission payments made to Defendants, Drive Planning and the Receivership Estate suffered damages and have been rendered liable to investors, creditors, and other third parties.

214. Defendants conducted no due diligence or inadequate due diligence, despite their duty to do so, before selling Drive Planning's Ponzi scheme products to the public and were paid the Commissions based upon this conduct.

215. Defendants, as Agents, sold illegal, unregistered securities to the public and were paid the Commissions based upon this conduct.

216. Defendants, as Agents, by selling Drive Planning's illegal, unregistered securities to the public endorsed, gave legitimacy to, and burnished the Drive Planning Ponzi scheme through the imprimatur of their support and sponsorship of Drive Planning and its Ponzi-scheme investment products, by, including, but not limited to, directly affiliating themselves with Drive Planning by among other things, appearing as a "Financial Consultant" on Drive Planning's website (www.driveplanning.com), utilizing an @driveplanning.com email address and account to communicate with Drive Planning personnel, themselves, the public (potential or existing investors), and representing to the public that Drive Planning's illegal and unregistered securities were prudent, safe, and sound investments when they were not.

217. Defendants did not act in "good faith" when they sold Drive Planning's illegal and unregistered securities to the public for their own profit without having conducted the required due diligence and remained willfully ignorant to the several red flags that would have provided notice of Drive Planning's fraudulent purpose to a financial professional selling a security when measured on an objective basis.

218. Those "red flags" included: (i) the 40% annualized return for a real estate bridge loan; (ii) the vague manner in which the R.E.A.L. Opportunity was described; (iii) the lack of any documentation supporting the claim that loans were collateralized; (iv) the lack of information concerning the purported real estate developers to whom or which the investors funds were being provided; (v) the lack of any insurance or other means to protect investors against losses given the absence of any documentation providing the investors with collateral; and (vi) the sophistication level of Mr. Burkhalter and Mr. Bradford and their lack of experience or references in the commercial real estate lending market.

219. Defendants, as Agents, to establish good faith, were required, but failed, to take the steps a prudent financial professional would have taken when receiving financial remuneration for the sale of an investment product or referral of an offering company, such as investigating: (i) the financial, performance, and personnel background of the offering company; (ii) the associated risk factors and costs surrounding the investment strategy or product needed to be disclosed and evaluated;

knowing they should never rely solely on a sponsor's or issuer's word about an investment product.

220. Defendants, to establish good faith, were required, but failed, to review available investment ratings from qualified rating services before selling or recommending Drive Planning's investment products, including the R.E.A.L. Opportunity.

221. Defendants, as Agents, to establish good faith, were required, but failed, to request and investigate audited financial statements from Drive Planning, as the sponsor and issuer, as well as any other literature provided by the company discussing its sales history and the background of key employees.

222. Defendants provided no value to Drive Planning by selling Drive Planning's illegal and unregistered securities to the public because those transactions constituted illegal transactions and the Agents cannot profit from illegal transactions under Georgia law. *See* O.C.G.A. § 13-8-1.

223. The Commission payments were not made by Drive Planning to Defendants in exchange for anything of equivalent value and represented nothing more than redirected funds Drive Planning had obtained from new participants in the Drive Planning Ponzi scheme.

224. Ponzi scheme "profits," which is what the Commissions constitute, are never received in exchange for value.

225. No agreement between Drive Planning and Defendants under which Drive Planning paid the Commissions is enforceable because Defendants' activities (*i.e.*, selling unregistered securities in violation of federal law) were illegal.

226. The Commission payments Drive Planning made to the Agents set forth on the Commission Schedules at **Exhibits A** through **HH** are avoidable and recoverable under the constructive fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(2).

227. The Receiver is entitled to an award of prejudgment interest based upon the amounts demanded and owed, pursuant to O.C.G.A. § 51-12.4.

228. Based upon information and belief, certain individual Defendants, who are the principals of entity Defendants, directed Drive Planning to pay the entity Defendants of which they are the principals, instead of them individually, even though such payments were for the benefit of the individual principals. Such individual Defendants presumably did so to have the entity Defendants act as a shield to protect the individuals from any liability associated with their involvement with Drive Planning. Those individual Defendants dominated and controlled their respective entity Defendants and caused such entities to transfer the Commission payments they received directly to or for the benefit of the individual principals, who then became subsequent transferees of the fraudulent transfers from Drive Planning. As it was the individual Defendants who actually solicited investors and sold the

Drive Planning investment products in exchange for which their entities were paid Commissions, the individuals, like their entities, lacked good faith and did not provide value to Drive Planning in exchange for the Commissions. As such, like the initial transfers of the Commissions from Drive Planning to the entity Defendants, the subsequent transfers of the Commissions from the entity Defendants to the individual Defendants are avoidable and recoverable under the constructive fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-78(b)(1)(B).

WHEREFORE, Kenneth D. Murena, as Receiver, respectfully requests the Court (A) enter judgment in his favor and against Defendants; (i) avoiding and recovering the Commission transfers as constructive fraudulent transfers under O.C.G.A. § 18-2-74(a)(2); (ii) determining that the entity Defendants were the alter egos of their individual principals rendering the individual principals liable or, alternatively, that the individual Defendants who received Commissions through entities were either the true beneficiaries of the transfers or the subsequent transferees of their entities; (iii) entering money judgment against each of Defendants in the amount of the Commission transfers they each received; (iv) awarding pre- and post-judgment interest on the amounts of the judgments entered against Defendant; and (v) taxing costs against Defendants; (B) reserve jurisdiction to impose constructive trusts on real or personal property of Defendants to which the

received Commission transfers are traced under applicable federal and state law; and (C) award such other and further relief as the Court shall deem just and proper.

**COUNT 3 – UNJUST ENRICHMENT**

(In the Alterative to Counts 1 and 2)

229. The Receiver sues Defendants and adopts, realleges, and incorporates paragraphs 1 through 170 into Count 3.

230. Defendants, as Agents, on behalf of Drive Planning, sold, or successfully solicited the purchase of, unregistered securities to the public in violation of the federal securities laws and received the Commissions in return for those sales.

231. Defendants sold, or successfully solicited the purchase of, Drive Planning's investment products, including the "R.E.A.L Opportunity" and were motivated at least in part by a desire to serve their own financial interests.

232. Defendants had direct contact with the investors to whom they sold Drive Planning's investment products, including the R.E.A.L. Opportunity.

233. Defendants received Commissions largely from the sales of Drive Planning's investment productions, including the R.E.A.L. Opportunity, to their own family, friends, clients, followers, acquaintances, and contacts, such that the investors' investments were caused by Defendants' solicitation.

234. Defendants directly and actively participated in the solicitation from the investors with whom or which they interacted of an immediate sale of Drive Planning's investment products, including the R.E.A.L. Opportunity.

235. The investors with whom or which Defendants interacted "invested" in, and therefore purchased, Drive Planning's investment products, including the R.E.A.L. Opportunity, as a result of Defendants' solicitation.

236. Defendants received the Commissions from Drive Planning for their direct solicitation of and securing funds from "investors," that was the purpose of the Commissions.

237. The Receiver, in Count 3, seeks to disgorge the Commissions Drive Planning paid to the Agents set forth in the Commission Schedules attached to this ancillary complaint as **Exhibits A** through **HH** pursuant to the Georgia common law claim of unjust enrichment.

238. Drive Planning conferred a benefit upon Defendants in the form of the Commissions.

239. Defendants received and accepted a benefit as a result of the wrongful payments made to them in the form of the Commissions.

240. Drive Planning made the Commission transfers to Defendants from investor funds and not from Drive Planning's own funds, because it essentially had none.

241. Defendants provided no compensation or benefit to Drive Planning for the receipt of the Commissions.

242. Defendants should not be allowed to benefit from the fraudulent Commission payments merely because they, themselves, were not to blame for the fraud.

243. Defendants do not have a legitimate claim to the funds they received in the form of the Commissions.

244. Based upon these facts, it is unjust for Defendants to retain the pre-receivership investor-derived money Drive Planning had paid to them.

245. The Commission payments were not made by Drive Planning to Defendants in exchange for anything of equivalent value and represented nothing more than redirected funds Drive Planning had obtained from new participants in the Drive Planning Ponzi scheme.

246. Ponzi scheme "profits", which is what the Commissions constitute, are never received in exchange for value.

247. No agreement between Drive Planning and Defendants under which Drive Planning paid the Commissions is enforceable because Defendants' activities (*i.e.*, the unregistered sale of securities in violation of federal law) were illegal.

248. Defendants should not receive a disproportionate share of the recovered investor funds.

249. These wrongful Commission payments directly and proximately injured Drive Planning and the Receivership Estate.

250. As a direct and proximate result of the Commission payments made to Defendants, Drive Planning and the Receivership Estate suffered damages and have been rendered liable to investors, creditors, and other third parties.

251. In equity, Defendants cannot be allowed to keep the money they were paid for soliciting and securing investors to the Drive Planning Ponzi scheme, thereby causing those investors to lose all or substantially all of their money, or if they are not in a net loss position, being subject to a lawsuit to recover the "false profits" they received by being part of a Ponzi scheme because of Defendants.

252. The Receiver is entitled to disgorgement of the Commission payments under Georgia's common law claim of unjust enrichment.

253. The Receiver is entitled to an award of prejudgment interest based upon the amounts demanded and owed, pursuant to O.C.G.A. § 51-12.4.

254. Based upon information and belief, certain individual Defendants, who are the principals of entity Defendants, directed Drive Planning to pay the entity Defendants of which they are the principals, instead of them individually, even though such payments were for the benefit of the individual principals. Such individual Defendants presumably did so to have the entity Defendants act as a shield to protect the individuals from any liability associated with their involvement with

Drive Planning. Those individual Defendants dominated and controlled their respective entity Defendants and caused such entities to transfer the Commission payments they received directly to or for the benefit of the individual principals, who then became subsequent transferees of the fraudulent transfers from Drive Planning. As it was the individual Defendants who actually solicited investors and sold the Drive Planning investment products in exchange for which their entities were paid Commissions, the individuals, like their entities, lacked good faith and did not provide value to Drive Planning in exchange for the Commissions. As such, like the initial transfers of the Commissions from Drive Planning to the entity Defendants, the subsequent transfers of the Commissions from the entity Defendants to the individual Defendants are avoidable and recoverable under Georgia's common law claim of unjust enrichment.

WHEREFORE, Kenneth D. Murena, as Receiver, respectfully requests the Court (A) enter judgment in his favor and against Defendants: (i) disgorging the Commission transfers as inequitable unjust enrichment benefits: (ii) determining that the entity Defendants were the alter egos of their individual principals rendering the individual principals liable, and entering money judgments against each of Defendants in the amount of benefit they unjustly and inequitably received in the form of Commission transfers they each received; (iii) awarding pre- and post-judgment interest on the amounts of the judgments entered against Defendant; and

(iv) taxing costs against Defendants; and (B) reserve jurisdiction to impose constructive trusts on real or personal property of Defendants to which the received Commission transfers are traced under applicable federal and state law; and (C) award such other and further relief as the Court shall deem just and proper.

Dated: June 30, 2026.

*s/ Henry F. Sewell*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com
*Local Counsel for Kenneth D. Murena, As Court-Appointed Receiver*

Russell Landy
*PHV Admission Forthcoming in this ancillary action*
Florida Bar Number 44417
rlandy@dvllp.com
Adriana Pavon
Admitted *Pro Hac Vice* in
Case No. 1:24-cv-03583-VWC
*PHV Admission Forthcoming in this ancillary action*
Florida Bar Number 1025060
apavon@dvcattorneys.com
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, FL 33131
Telephone: (305) 371-3960

*Lead Counsel for Kenneth D. Murena, as Court-Appointed Receiver*